# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00440-COA

**LOOMIS MUHAMMAD A/K/A LOOMIS MUHAMMED A/K/A LOOMIS A. MUHAMMAD A/K/A LOOMIS A. MUHAMMED A/K/A LOOMIS AJIHAD MUHAMMAD**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/31/2024 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | DANIEL MYERS WAIDE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | BRAD RODRICK THOMPSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 03/31/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. Loomis Muhammad was convicted of one count of aggravated domestic violence against his girlfriend. At his trial, the State presented evidence of prior acts allegedly related to Muhammad's claim of self-defense. Following his conviction, Muhammad appealed the introduction of the prior bad acts evidence, among other issues. After review, we find that the trial court abused its discretion by allowing the State to admit the prior bad acts and that Muhammad was prejudiced by the ruling. We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2.     In October 2022, Claudia Roan walked from the apartment she shared with her boyfriend, Muhammad,[1] to a nearby car dealership. Roan told a dealership employee, Tasha Rhodes, that she was looking for a car because her boyfriend had taken her car away. Roan and Muhammad had gotten in an argument earlier that day over text messages Roan was sending to someone else, and Muhammad took her cell phone and car keys away.

¶3.     While Rhodes was trying to process Roan's credit information, they discovered a block on Roan's credit history. Roan said she could unblock it if Rhodes could give her a ride to her apartment. Rhodes agreed and drove Roan to Laurelwood Apartments. Rhodes waited in the car while Roan went inside.

¶4.     Roan testified at trial that when she walked toward the apartment, Muhammad met her outside and told her she was no longer on the lease and that she needed to leave. Roan testified that she still had a key, so she walked past Muhammad. He followed her, repeating that she was not allowed inside. Once Roan got inside, she tried to close the door to keep Muhammad out. Roan testified that they were both pushing on the door until she eventually backed away, and then Muhammad came inside. Roan said she tried to explain that she was there to get her laptop so she could unfreeze her credit, but Muhammad kept telling her she had to leave.

¶5.     Roan testified that when she turned to walk away, Muhammad hit her from behind with his fist. An altercation ensued. Roan testified that they were both on the ground in the hallway. She grabbed at his necklace chains and broke them, which made Muhammad

_____

[1] Muhammad's wife, Siri, also lived in the home. Testimony at trial revealed a romantic relationship among all three adults.

2

angrier. Roan testified that she rolled away and told Muhammad she was leaving. She said, "As soon as I'm on my hands and my knees, that's when he pistol-whipped me from behind, and he pistol-whipped me four times."

¶6.　　Roan left the apartment and walked toward Rhodes, but Muhammad followed her. Rhodes testified at trial that she had stepped out of her car for a cigarette and saw Roan running from the side of the building, holding her bleeding face. Roan told Rhodes to call the police because Muhammad had pistol-whipped her with a gun. Rhodes testified that she was trying to figure out what was going on when she saw Muhammad coming. Roan told her again to call the police, and they jumped in the car to get away. As they drove away, Roan said that Muhammad was following them, and Rhodes started driving faster to try to lose him. They drove to the car dealership and hid while Rhodes called the police.

¶7.　　Officer Regan Smith of the Jones County Sheriff's Department responded to the call at the dealership. Smith's body camera recorded the entire time she was at the car dealership, and the recording was admitted into evidence over objection and played for the jury. When Smith arrived, she spoke with Roan and got her story—that she and Muhammad, her boyfriend, had gotten into a physical fight, and he had hit her with a firearm. Roan went to the hospital by ambulance and was treated for her head injuries. Roan testified that she received four staples in her head, two per wound.

¶8.　　After Smith left the dealership, she drove to the sheriff's department, where she encountered Muhammad. Muhammad had driven himself to the sheriff's department to give his side of the story. Muhammad told Smith that Roan returned to the apartment in an

3

unfamiliar vehicle, and he tried to ask who was with her. Smith testified that Muhammad said Roan pushed past him into the apartment, where the altercation began. Muhammad told Smith he "had to pistol-whoop [Roan] off [him]." Smith testified that Muhammad did not have a weapon with him at the sheriff's department but she noticed that he was wearing a holster. Smith testified that she did not initially notice any injuries on Muhammad, but near the end of her conversation with him, she saw a scratch behind his ear on the left-hand side of his neck.

¶9. Based on Roan's story and injuries and Muhammad's admission to Smith that he had "pistol-whoop[ed]" Roan, he was arrested for aggravated domestic violence. Investigator Denny Graham interviewed Muhammad at the sheriff's department the next day. Graham testified that he did not notice any injuries on Muhammad. The interview was recorded and played for the jury.

¶10. Muhammad testified in his defense. Muhammad testified that he had prior medical issues from car wrecks and work-related incidents, including heart problems, a partial lung, and back injuries. He said he was not physically strong and that Roan often physically dominated him. Muhammad testified that Roan often became physical when she was angry. He described one incident when she was upset and he made a joke about it, and she slapped him.

¶11. On the day of the incident, Muhammad was packing his car for a two-week trip to Alabama to see family. He testified that he had told Roan repeatedly that she needed to find a new place to live. That morning, they got into an argument, and Muhammad told Roan she

needed to leave. She left the apartment, and he continued to pack. The next time Muhammad saw Roan, he was carrying bags down the stairs to the car, and Roan was coming up the stairs toward the apartment. Muhammad testified that she was running up the stairs. Muhammad said he asked where she was going, and she seemed to want to argue. He followed her back to the apartment, where she shut the door and tried to lock him out.

¶12. Muhammad and Roan were arguing through the door, and a neighbor came out. Muhammad said that Roan stopped trying to close the door when she heard the neighbor's voice. Muhammad went inside, and Roan was in the hallway with her arms crossed. They began arguing again, and Muhammad said he tried to walk past her to leave. Muhammad testified that as he got near Roan, she jumped on him and began beating him. Muhammad said he fell face forward, and Roan fell on top of him.

¶13. Muhammad testified that he and Roan were struggling on the floor and that he was pushing against the wall with his feet to get leverage to stand up. He said that Roan was hitting him and tried choking him. He thought she was going to kill him, so Muhammad reached for his gun. Muhammad testified that he released the magazine on the gun and hit Roan on the head with the magazine to get her to stop. Muhammad said that Roan stopped momentarily and then started hitting him again. They scuffled some more, but Muhammad broke away and went into the kitchen. Roan left, and Muhammad called 911. Muhammad went to the sheriff's department to report Roan's attack. He pressed charges against her in the Jones County Justice Court six days after the incident.

¶14. The jury found Muhammad guilty of one count of aggravated domestic violence. The

circuit court sentenced him to twelve years in the custody of the Mississippi Department of Corrections, with ten years to serve and two years suspended.

¶15. Muhammad filed a post-trial motion for a judgment notwithstanding the verdict or a new trial, which was denied. This appeal followed.

**ANALYSIS**

¶16. On appeal, Muhammad raises eight issues. After review, we reverse and remand for a new trial after determining that evidence was admitted in error and resulted in prejudice. We therefore decline to address most of Muhammad's remaining issues, but we do address sufficiency and one evidentiary issue likely to occur again on remand.

### I. Muhammad's prior acts should not have been admitted.

¶17. Muhammad argues that the trial court erred by allowing the State to reference prior unrelated incidents involving alleged bad acts by Muhammad. He argues that the acts as presented by the State were not similar in time, place, or fact with the charge of aggravated domestic violence; they bore no relevance to the crime for which he was charged; and they served no valid purpose under the rules of evidence.

¶18. We review the admission of evidence for an abuse of discretion. *Johnson v. State*, 204 So. 3d 763, 766 (¶7) (Miss. 2016). We will not reverse "[u]nless the judge abuses this discretion so as to be prejudicial to the accused." *Gore v. State*, 37 So. 3d 1178, 1183 (¶13) (Miss. 2010). Evidence of other crimes, wrongs, or acts must not be admitted if it is used to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). It may be admitted "for another purpose,

6

such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). This is not an exhaustive list. *Johnson*, 204 So. 3d at 768 (¶14).

¶19. Even if evidence of other bad acts is admissible under Rule 404, it may not be admitted if "its probative value is substantially outweighed by a danger of" unfair prejudice or confusing the issues, among other dangers. MRE 403. As with all evidence, any evidence admitted through Rule 404 must also be relevant. MRE 401.

¶20. During Muhammad's cross-examination, the State moved to introduce evidence of two incidents that the State claimed showed "motive on his part, intent, lack of accident or mistake" as it applied to his self-defense claim. Muhammad's counsel argued that neither incident related to a claim of self-defense.

¶21. The State presented an incident report from the Jones County Sheriff's Department from March 2023, in which an officer responded to a complaint by an employee at Siri's workplace. The narrative stated that Muhammad had "shown up at the business for . . . two days in a row looking for Siri" and that Muhammad and Siri had "domestic issues." The narrative stated that Muhammad "show[ed] up looking for [Siri,] agitated[,] and will just sit [and] watch for her." On one occasion, Muhammad allegedly drove into an employees-only area to look for Siri and had asked other employees where she was and when she got off work.

¶22. The second incident was from February 2022, and the State presented a report from the Laurel Police Department. The report detailed a narrative from one of Muhammad's

7

coworkers, who alleged that she had found a bottle of alcohol in a work vehicle and confronted Muhammad about it, leading to a disagreement. The employee reported that Muhammad "began to get irate and upset, and began yelling and screaming in the vehicle." The employee claimed that Muhammad jerked the steering wheel from the driver, causing the vehicle to crash. Muhammad then allegedly told the employee that he would "put a bullet in [the employees'] head[s]" and kill them.

¶23.  After reviewing the written reports, the trial court ruled that the State would be allowed to cross-examine Muhammad about prior acts but could not admit the reports into evidence. The judge noted that he had allowed Muhammad to testify about incidents when Roan was the alleged aggressor, and he would allow the State to do the same with Muhammad. The trial court recessed overnight to allow the judge to review the reports in more detail. The next morning, the trial judge fleshed out his earlier ruling, noting that Muhammad had testified about his physical frailties and that these incidents could impeach that testimony. The trial judge stated that the jury would be given a limiting instruction to consider the evidence only as to Rule 404(b) purposes, as well as evidence of a lack of self-defense. The trial judge noted that he had weighed the evidence under Rule 403 and did not find the probative value to be substantially outweighed by a risk of unfair prejudice.

¶24.  Although the trial judge properly considered Rule 404 and Rule 403 when weighing the admission of this prior acts evidence, we find that the judge's admission of the evidence was an abuse of discretion. In this case, Muhammad was charged with striking Roan, his girlfriend, in the face and head with his fist and a firearm. Neither prior incident bore any

8

similarity to the one at issue: the victims and alleged behavior were different, and the only commonality was Muhammad. Contrary to what the State argued on appeal and at trial, neither incident had any relation to Muhammad's claim of self-defense, as there was no evidence in either prior incident that Muhammad had claimed self-defense. At trial, Muhammad denied that the February 2022 incident happened at all, and he denied any malicious behavior or intent when looking for Siri at her workplace.

¶25.    The March 2023 incident from Siri's workplace was not relevant, and the State should not have been allowed to elicit evidence about it from Muhammad. Nothing about that incident bore any bearing or relation to the event for which Muhammad was on trial, and it made no "fact more or less probable." MRE 401.[2] Similarly, the State should not have been allowed to elicit evidence about the February 2022 incident. Nothing about the February 2022 incident spoke to Muhammad's motive, opportunity, intent, lack of mistake or accident, or his self-defense claim. The only reason to admit evidence of Muhammad's alleged aggression through these acts was to suggest precisely what is prohibited by Rule 404(a)(1)—to present evidence of his allegedly aggressive character and suggest that he acted in conformity with that character in the instant case. MRE 401.

¶26.    Although we conclude that the trial court abused its discretion by allowing the State to introduce evidence of Muhammad's character and prior acts, we reverse only if the abuse of discretion resulted in prejudice. *Gore*, 37 So. 3d at 1183 (¶13). After a thorough review

---

[2] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." MRE 401.

of the record, we find that the admission of the evidence prejudiced Muhammad. He and Roan were the only people who witnessed the altercation at issue, and each presented testimony that painted the altercation as violent and desperate. The only substantial difference in each version was the identity of the aggressor. When the State was allowed to introduce evidence suggesting that Muhammad had a tendency to become "irate and upset" or "agitated" and that he acted out in a violent rage, this necessarily tipped the scales against Muhammad's version of events. Without the State's evidence, we cannot say that there was overwhelming evidence of Muhammad's guilt, so we cannot conclude that the error was harmless. *See Galarza v. State*, 385 So. 3d 862, 870 (¶24) (Miss. Ct. App. 2024) (applying harmless-error analysis to determine whether there is overwhelming evidence of guilt sufficient to outweigh the harm done by allowing admission of the evidence). We therefore reverse and remand for a new trial.

## II.    There was sufficient evidence of guilt.

¶27.    Although we reverse Muhammad's conviction on other grounds and remand for a new trial, we must address his challenge to the sufficiency of the evidence. *Newell v. State*, 175 So. 3d 1260, 1267-68 (¶5) (Miss. 2015). We do so because we would reverse and render if we concluded the State presented insufficient evidence, and the double jeopardy clause would bar retrial. *Id.*

¶28.    When determining whether the State presented sufficient evidence of a defendant's guilt, "this Court must ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McCarty v. State*, 342 So. 3d 520, 534-35

10

(¶53) (Miss. Ct. App. 2022) (citation and quotation mark omitted). We must view the evidence in the light most favorable to the State and grant the State all favorable inferences that can be reasonably drawn from the evidence. *Id.* If the jury could find the essential elements of the crime charged to be proven beyond a reasonable doubt, we will affirm. *Id.*

¶29. Muhammad was charged with aggravated domestic violence pursuant to Mississippi Code Annotated section 97-3-7(4) (Rev. 2020), and the State was required to prove that he purposely and knowingly caused serious bodily injury to Roan, his girlfriend, by striking her in the face and head with a fist and striking her in the face with a firearm.

¶30. Muhammad argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he struck Roan in the face and head and that Roan did not testify that Muhammad struck her in the back of the head with his fist. However, the evidence shows that a reasonable juror could find the essential elements to have been proven beyond a reasonable doubt. Viewing the evidence in the light most favorable to the State, Roan's testimony supports the conclusion that Muhammad was the initial aggressor and struck her in the face and on the top of the head with both his fist and his gun. Muhammad did not deny that he struck Roan in the face or head; he claimed only that he had done so in self-defense, a claim the jury was entitled to reject. The State also presented evidence of Roan's serious bodily injuries through Roan's and Smith's testimony about the bleeding wounds to her head, which required hospitalization and staples.

¶31. Because we find that the State presented sufficient evidence to support Muhammad's conviction for aggravated assault, we decline to render a judgment of acquittal.

11

### III. The body camera footage should be limited on remand.

¶32. Although we reverse and remand, we will address the admission of the body camera footage because it was admitted in error and is likely to appear again on remand. *See generally Davis v. State*, 970 So. 2d 164 (Miss. Ct. App. 2006). Before trial, Muhammad objected to the State playing the body camera video, which contained Roan's recorded interview, "for obvious hearsay reasons" and because it would be duplicative if Roan testified. The State argued that the body camera video showed Roan's demeanor and injuries and that it was relevant for that reason. The trial judge summarily overruled Muhammad's objection with no further discussion. When the State sought to introduce Smith's body camera video into evidence, Muhammad renewed his objection, which was again overruled.

¶33. Smith's body camera video is a little over nineteen minutes long. It begins with Smith interacting with Roan at the car dealership upon arrival and gathering her name and personal information. Car dealership employees can be seen on the video bringing her water and ice. Paramedics arrive and take Roan to the ambulance, where they view her head wound and start to treat it. One of the paramedics begins asking Roan questions, and then Smith takes over. Roan tells Smith her side of the story, and Smith takes notes. Roan's story largely matched her trial testimony. Smith took photos of Roan's injuries. Then Smith spoke with Rhodes, whose story also matched her trial testimony.

¶34. The State did not address at trial or on appeal Muhammad's pretrial objection to the hearsay of Roan's interview, focusing instead on the relevance of Roan's demeanor and injuries. The trial judge likewise did not seem to appreciate Muhammad's objection to

12

Roan's interview being played for the jury and simply overruled Muhammad's objection. The trial court abused its discretion by allowing the full body camera video to be admitted into evidence.

¶35. The early portions of the video showing Roan's demeanor following the alleged assault and her injuries are relevant, but the recorded interviews of Roan and Rhodes should be omitted from the jury's viewing. On remand, should the State seek to introduce the body camera video, Smith's interviews of Roan and Rhodes should not be shown to the jury, as they contain hearsay and are duplicative of trial testimony.

## CONCLUSION

¶36. Because the trial court abused its discretion by admitting evidence of unrelated, irrelevant prior acts that met no exception under Rule 404 and caused prejudice, we reverse and remand for a new trial. However, we do not render a judgment of acquittal because the State presented sufficient evidence to have sustained a conviction. On remand, we caution the State to limit its use of Smith's body camera video to avoid hearsay or duplicative evidence. We address no other issues raised by Muhammad.

¶37. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY AND WEDDLE, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**